# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE      )
                            )
                            )      Def. I.D. # 1809015387
      v.                        )
                            )
                            )
JERRY REED,            )
                            )
      Defendant.        )

Submitted: June 17, 2022
Decided: July 27, 2022

*Upon Defendant's Amended Motion for Postconviction Relief (R-1)*

**DENIED**

## MEMORANDUM OPINION AND ORDER

Matthew C. Bloom, Esquire, Caroline Brittingham, Esquire, and Nichole Gannett, Esquire, Deputy Attorneys General, Department of Justice, 13 The Circle, Georgetown, DE 19947; Attorneys for State of Delaware.

Patrick J. Collins, Esquire, 8 East 13th Street, Wilmington, DE 19801; Attorney for Defendant Jerry Reed.

**KARSNITZ, R. J.**

# I. FACTUAL BACKGROUND

I will briefly summarize the facts, since they are set forth in great detail in my 2020 opinion[1] and in the Delaware Supreme Court's 2021 opinion.[2] On September 26, 2018, Delaware State Police responded to a report of a bullet-riddled body found in the weeds along the edge of Portsville Pond outside Laurel, Delaware. Police identified the body of Isaac Hatton (" Mr. Hatton"). The homicide investigations identified Traevon Dixon ("Mr. Dixon") and Jerry Reed ("Mr. Reed") as the likely perpetrators of the crime. The investigation focused upon an incident which occurred around 8:30 p.m. at the Little Creek Deli in Laurel. Police investigators interviewed witnesses and located video surveillance. The video showed parts of what police described as a verbal altercation between the victim and co-defendants Messrs. Dixon and Reed.

After the incident in Laurel, several vehicles including one in which the victim traveled left Laurel. Investigators, through various witness interviews, determined that the victim and co-defendants traveled to Portsville Pond where Mr. Hatton was shot and killed. Co-defendants Dixon and Reed were charged with first degree murder[3] and possession of a firearm during the commission of a felony ("PFDCF").[4]

---

[1] *State v. Reed*, 2020 WL 3002963 (Del. Super. June 4, 2020).
[2] *Reed v. State*, 258 A.3d 807 (Del. 2021).
[3] 11 *Del. C.* § 636.
[4] 11 *Del. C.* § 1447.

1

## II. PRODECURAL BACKGROUND

Mr. Dixon was first scheduled for trial. He pled guilty to second degree murder[5] and the weapons charge in late 2019. I sentenced Mr. Dixon to a total of 35 years at Level 5 incarceration suspended after serving 20 years, and additional periods of probation.

Mr. Reed was scheduled for trial in January, 2020. Shortly before the trial, counsel for the parties notified me that an agreement had been reached as to pleas to be entered by Mr. Reed. On January 13, 2020 Mr. Reed pled guilty to manslaughter[6] and *nolo contendere* to the weapons charge. Notably Mr. Reed's plea involved a lesser offense than that to which his co-defendant Mr. Dixon had pled guilty. I conducted the formal and typical plea colloquy with Mr. Reed required of me by law, including the Superior Court Criminal Rules.[7] Mr. Reed was given appropriate advice at the plea hearing, including the crimes to which he was entering a plea, the effect of the pleas including the effect of the *nolo contendere* plea, and the potential sentences. Mr. Reed signed a Plea Agreement as well as a Truth-in-Sentencing

---

[5] 11 *Del. C.* § 635.
[6] 11 *Del. C.* § 632.
[7] Super. Ct. Crim. R. 11.

Guilty Plea Form which outlined what was happening. I also reviewed with Mr. Reed the important rights he surrendered by pleading as he did. Finally, Mr. Reed admitted to me he was guilty of Manslaughter, and that the *nolo contendere* plea to the weapons charge was as effective as a plea of guilty. In short, I was fully satisfied Mr. Reed entered his pleas knowingly, voluntarily and intelligently.

Eight days after entering his pleas, Mr. Reed wrote to me asking to withdraw them.[8] Since I am not permitted to consider motions from represented defendants,[9] I sent a copy of Mr. Reed's letter in which he sought to withdraw his pleas to his two trial counsel ("Trial Counsel").

I sentenced Mr. Reed on February 28, 2020. Despite having pled guilty to a lesser charge than Mr. Dixon, I sentenced him to a term almost identical to that imposed upon Mr. Dixon, for reasons I articulated in my 2020 opinion.

Mr. Reed did not file an appeal to the Delaware Supreme Court. Rather, he filed three *pro se* motions with this Court. First, Mr. Reed filed a motion to withdraw his pleas (the "Rule 32(d) Motion").[10] That motion was dated "February __, 2020"

---

[8] Super. Ct. Crim. R. 32(d).
[9] Super. Ct. Crim. R. 47; *Jones v. State,* 2020 WL 2280509 (Del. May 7, 2020).
[10] Super. Ct. Crim. R. 32(d). Mr. Reed asserted the following eight grounds: (i) insufficient evidence of his guilt; (ii) the ballistics evidence suggested that there was only one shooter; (iii) the State deprived him of equal protection under the law by entering into cooperation agreements with certain witnesses rather than prosecuting them; (iv) Trial Counsel failed to alert him to a lie in the police reports; (v) the physical evidence proved his innocence; (vi) Mr. Dixon gave a prior inconsistent statement to the police about whether Mr. Reed ordered him to shoot Mr. Hatton; (vii) Trial Counsel should not have told him to accept the plea because Mr. Dixon already admitted to

3

and docketed on March 2, 2020; it is therefore likely that the motion was mailed prior to sentencing on February 28, 2020, but docketed thereafter.

Second, on March 31, 2020, Mr. Reed filed a motion for postconviction relief (the "Rule 61 Motion").[11] Because several of his claims involved the ineffective assistance of Trial Counsel, I required Trial Counsel to file an affidavit responding to these claims (the "First Trial Counsel Affidavit").

Third, on April 13, 2020, Mr. Reed filed a motion seeking modification of his sentence (the "Rule 35 Motion").[12]

In my 2020 opinion I denied all three motions.

Mr. Reed filed a timely Notice of Appeal with the Delaware Supreme Court. Mr. Reed raised two issues on appeal. First, he contended that his right to an

---

shooting Mr. Hatton; and (viii) Trial Counsel told him that he should plead guilty rather than fight a system that is biased against "Black people and minorities." A157–59.

[11] Super. Ct. Crim. R. 61. Mr. Reed asserted the following seven grounds: (i) Trial Counsel were ineffective for not filing a motion to withdraw the plea upon Mr. Reed's request; (ii) Trial Counsel coerced his guilty plea by telling Mr. Reed, "that if [he] go[es] to trial, [he] was going to lose and get found guilty either way because [he] was going up against a system that's already against Blacks and minorit[ies] to lose;" (iii) the State denied him "equal protection of the law" by entering cooperation agreements with certain witnesses; (iv) I was biased against him at sentencing; (v) the State brought up his past crimes at sentencing, including conduct for which he had not been convicted; (vi) Trial Counsel failed to present evidence of his innocence, including that Mr. Dixon made a prior inconsistent statement; and (vii) the police lied in their report. A163–64.

[12] Super. Ct. Crim. R. 35. Mr. Reed asserted the following four grounds: (i) the State improperly referred to past crimes for which he had never been convicted; (ii) he had accepted responsibility for his actions and that he accepted "the fact that by [his] being a part of instigating the fight is a reason that the victim was killed which is a big part in this;" (iii) "the presumptive sentence for a charge of Manslaughter is 2–5 years at level 5 incarceration and I was sentenced to 15 years for Manslaughter and the penalty range is '2–25 years;' " and (iv) Trial Counsel advised that he would receive a seven to ten-year sentence. A166.

4

autonomous determination of his plea was violated when Trial Counsel refused to file his requested motion to withdraw his guilty plea prior to sentencing and when I refused to consider his timely *pro se* motion to withdraw his plea. Second, he contended that I erred in denying his Rule 61 motion for postconviction relief because he was deprived of the effective assistance of counsel when Trial Counsel gave him certain advice concerning his guilty plea and they failed to file a motion withdrawing his guilty plea. The Delaware Supreme Court held that, because Mr. Reed did not fairly present his separate autonomy challenge below, he had waived his autonomy claim. Because Mr. Reed's challenges focused on the propriety of Trial Counsel's representation during the plea process leading up to sentencing, the Delaware Supreme Court considered his challenges in the context of his Rule 61 ineffective assistance of counsel claims under the legal standards of *Strickland v. Washington*[13] as adopted in Delaware.[14]

The Delaware Supreme Court reversed my 2020 opinion, and remanded the case to this Court to conduct an evidentiary hearing and, after a full hearing, to address the following questions under the two-prong test of *Strickland*: (1) were Trial Counsel ineffective with respect to legal advice which may have induced Mr. Reed's guilty plea; (2) were Trial Counsel ineffective for not filing a motion to

---

[13] 466 U.S. 668 (1984).
[14] *Albury v. State*, 551 A.2d 53 (Del. 1988).

withdraw Mr. Reed's guilty plea prior to sentencing; and (3) did the failure to file a motion to withdraw Mr. Reed's guilty plea prior to sentencing prejudice Mr. Reed. I will refer to (1) as the "Advice Claim" and (2) and (3), together, as the "Withdrawal Claim."

On January 6, 2022, Mr. Reed filed an Amended Motion for Postconviction Relief (the "Amended Rule 61 Motion"). On February 8, 2022, Trial Counsel filed another joint affidavit (the "Second Trial Counsel Affidavit") in response to the Amended Rule 61 Motion. The parties then agreed that it would be preferable to hold an evidentiary hearing and then proceed with briefing. An evidentiary hearing was held on March 11, 2022. Postconviction Counsel submitted his Opening Post-Hearing Brief on April 21, 2022, the State submitted its Answering Post-Hearing Brief on May 23, 2022, and Postconviction Counsel submitted his Reply Brief on June 17, 2022. This is my decision on the ineffective assistance of counsel claims under the Amended Rule 61 Motion.

### III. LEGAL STANDARD

Claims of ineffective assistance of counsel are assessed under the two-part standard established in *Strickland*, as applied in Delaware. Under *Strickland*, Mr. Reed must show that (1) counsel's representation "fell below an objective standard of reasonableness" (the "performance prong"); and, (2) the "deficient performance

6

prejudiced [his] defense" (the "prejudice prong").[15]  In considering the performance prong, the United States Supreme Court stated that "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."[16]  *Strickland* requires an objective analysis, making every effort "to eliminate the distorting effects of hindsight" and to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[17]  Moreover, "strategic choices about which lines of defense to pursue are owed deference commensurate with the reasonableness of the professional judgments on which they are based."[18]  As to the performance prong, Mr. Reed must show that counsel's decisions were not reasonable strategic decisions.

As to the prejudice prong, Mr. Reed must demonstrate that there exists a reasonable probability that, but for counsel's unprofessional errors, the outcome of the trial would have been different.[19]  Even if counsel's performance were professionally unreasonable, it would not warrant setting aside the judgment of conviction if the error had no effect on the judgment.[20]  A showing of prejudice

---

[15]  *Strickland* at 687.
[16]  *Id*. at 690.
[17]  *Id.* at 689.
[18]  *Id.* at 681.
[19]  *Id.* at 687; *Zebroski v. State,* 822 A.2d 1038, 1043 (Del. 2003); *Wright v. State,* 671 A.2d 1353, 1356 (Del. 1996).
[20]  *Strickland,* at 691.

"requires more than a showing of theoretical possibility that the outcome was affected."[21]

*Strickland* teaches that there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in a particular order, or even to address both parts of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed.[22] In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.[23]

In its 2021 decision, the Delaware Supreme Court resolved several of the performance prong and prejudice prong questions with respect to both the Advice Claim and the Withdrawal Claim.

### Advice Claim

With respect to the Advice Claim, Mr. Reed claims that his counsel told him that he would be convicted irrespective of his guilt because of his race. When he

---

[21] *Frey v. Fulcomer,* 974 F.2d 348, 358 (3d Cir. 1992).
[22] *Strickland* at 697.
[23] *Id*. at 696.

8

entered his plea, and when he engaged in the plea colloquy with the trial judge, Mr. Reed claims to have been operating under that advice.[24] The Delaware Supreme Court and the State (without conceding the point) agreed that, *if* counsel told Mr. Reed words to the effect that "a Black man will not receive a fair trial in Sussex County," both the performance and prejudice prongs of *Strickland* would be met and counsel's representation would have been ineffective.[25] Thus, the Advice Claim goes to the issue of the voluntariness of his plea itself, and resolution of this issue involves determining whether the plea can stand. Given what the Supreme Court viewed as the generality and ambiguity of the First Trial Counsel Affidavit, it directed me to hold an evidentiary hearing to determine exactly what advice was given to Mr. Reed relating to the Advice Claim, and whether and how such advice affected the voluntariness of his plea. Thus, the critical evidence from the evidentiary hearing is exactly what Trial Counsel told Mr. Reed in this regard.

The Delaware Supreme Court noted:

> Of particular importance is the precise content of counsel's advice to Mr. Reed about how his race, or the racial mix of the Sussex County jury pool, would affect his trial prospects and the impact of any such advice on the voluntariness of his plea.[26]

---

[24] As discussed further below, this would mean that Mr. Reed was untruthful in answering my questions during the colloquy.

[25] *Reed v. State*, 258 A.3d at 825-826.

[26] *Id*. at 831.

### *Withdrawal Claim*

With respect to the performance prong of the Withdrawal Claim, the Supreme Court held:

> [A] criminal defendant's control of the objectives of the representation prior to sentencing requires that counsel either obey an instruction to file a motion to withdraw a guilty plea, or seek leave to withdraw so that the defendant can file the motion with other counsel or *pro se*. If the defendant's reasons for filing the motion to withdraw include an assertion that his or her counsel has been ineffective or coerced the defendant into pleading, then defense counsel should ask the court to appoint new unconflicted counsel to handle the filing of the motion. Even if counsel believes the defendant's motion is contrary to his interest or is without merit, a defendant's decision to attempt to withdraw a plea prior to sentencing cannot be overruled by counsel. This, of course, does not mean that counsel may not urge the client to reconsider if counsel believe that a motion to withdraw the plea is unwise or contrary to the client's interests. As noted above, once the plea is accepted by the court, but before sentencing, a defendant's right to withdraw the plea is not unqualified (unlike his decision to plead prior to the court's acceptance of it). Rather, the defendant must satisfy the court that he has a "fair and just" reason.[27] (Footnotes and Citations Omitted)

Since Mr. Reed asked Trial Counsel to file a motion to withdraw his guilty plea before sentencing and did not rescind that request, and since Trial Counsel failed to file the motion or clear the way for Mr. Reed to file it himself, the Delaware Supreme Court held that Trial Counsel's failure constituted deficient performance under the first prong of *Strickland*.

---

[27] *Id.* at 829.

With respect to the prejudice prong of the Withdrawal Claim, the Delaware Supreme Court stated that, in order for Mr. Reed to prevail under *Strickland*, he still must show that Trial Counsel's failure to file the motion to withdraw his guilty plea caused him prejudice. The Delaware Supreme Court held that, to satisfy the prejudice prong of Strickland, Mr. Reed would have to demonstrate that, but for Trial Counsel's deficient performance, he "would have insisted on going to trial and that the trial court would have granted his motion to withdraw his plea."[28] In my 2020 opinion, because I did not find that that the performance prong had been met with respect to the Withdrawal Claim, I did not address the prejudice prong of the Withdrawal Claim, leaving the record undeveloped. Thus, the Delaware Supreme Court directed me on remand, in light of its holding on the performance prong, to conduct an evidentiary hearing and additional fact-finding on the prejudice prong. Specifically, the Delaware Supreme Court asked me to consider the five *Scarborough*[29] factors to determine that question.[30]

The Delaware Supreme Court noted:

> The Superior Court should also determine, through additional fact-finding, whether Mr. Reed at any point rescinded his instructions to counsel to withdraw his guilty plea and whether his counsel appropriately considered the *Scarborough* factors when they decided to override Mr. Reed's instructions regarding the plea withdrawal motion. The Superior Court should then address Mr. Reed's Rule 61 challenges

---

[28] *Id.* at 829-830.
[29] *Scarborough v. State* , 938 A.2d 644, 649 (Del. 2007) .
[30] *Reed v. State* at 829-830.

considered herein in view of the evidentiary record as further developed.[31]

## IV.    EVIDENTIARY HEARING

At the March 11, 2022 evidentiary hearing, Mr. Reed testified and called his two Trial Counsel as witnesses.[32] I also questioned two of the witnesses.  A summary of their testimony follows.

### *Jerry Reed*

Mr. Reed had a meeting with both Trial Counsel the weekend before final case review.[33]  Trial Counsel explained the plea offer to Mr. Reed and told him he had three days to decide.[34] Trial Counsel told him that going to trial as opposed to taking a plea was a gamble. Mr. Reed stated that he did not want to accept the plea. Trial Counsel asked Mr. Mr. Reed to sign the plea agreement in case he changed his mind and explained they would be speaking to his family members.[35] Upon questioning from me, Mr. Reed explained he signed the plea agreement despite not wanting to

---

[31] *Id.* at 831 ("As the United States Supreme Court in *Strickland* held, courts must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.")

[32] The witnesses were sequestered.

[33] Billing records and other testimony indicate the meeting was January 2, 2020. *See*, A846.

[34] A281.

[35] A283.

plead guilty because Trial Counsel advised him that, by signing it beforehand, if he changed his mind, "it's already signed and ready."[36]

Mr. Reed testified that Trial Counsel returned the following evening and Mr. Reed told them he had not changed his mind and still wanted to go to trial.[37] Mr. Reed was transported to court on January 6, 2020 and rejected the plea offer.[38]

On the trial date of January 13, 2020, Mr. Reed was transported to court[39] Mr. Reed testified that he was dressed and ready for trial when Trial Counsel met with him.[40] At that point, Mr. Reed testified that Trial Counsel tried to convince him for "like, an hour and a half" that it was in his best interest to take the plea.[41] They told him his odds had gone down and that what once was a 50/50 was now an 80/20 chance of losing at trial.[42] They told him that if he went to trial, "you willingly put your life in the hands of a system that's already set up to go against blacks and minorities."[43] Because of this, he might lose at trial and could get a life sentence.[44] Specifically, Trial Counsel explained that the jury would not be his peers; instead it would be all older people and white people. These people, according to trial counsel,

---

[36] A327.
[37] *Id.*
[38] *See*, A70-82.
[39] A287.
[40] A287.
[41] *Id.*
[42] A288.
[43] A289.
[44] A316.

13

would not know where he came from, what he has experienced, or why he lied to police.[45] This was the only meeting in which Trial Counsel discussed the makeup of the jury with Mr. Reed.[46]

Trial Counsel told Mr. Reed that he had lost every murder trial he had defended in Sussex County but won each one in Kent County.[47] Trial Counsel told Mr. Reed that the jury system in Sussex is more "messed up" than in Kent, and "there's no win in Sussex County."[48]

Trial Counsel also discussed the case of another defendant who had been in pretrial detention with Mr. Reed. Trial Counsel told Mr. Reed that the other defendant was offered the same plea as Mr. Reed, went to trial, and was sentenced to life plus 32 years.[49]

Trial counsel urged Mr. Reed to consider that if he took the plea, he would be home before his young daughter graduated high school.[50]

Trial Counsel showed Mr. Reed a handwritten paper listing various exposure times for a plea vs. a trial. The paper lists under the heading "trial" an incarceration exposure of twenty years to life if he was convicted of Murder Second Degree and

---

[45] A290.
[46] A308, A316.
[47] A296.
[48] A290.
[49] *Id.*
[50] A291.

14

the firearms charges.[51] The Manslaughter scenario was also listed, with a minimum mandatory sentence of twelve years.[52] The plea scenario listed a minimum mandatory of seven years.[53] Trial Counsel told Mr. Reed that if he took the plea he could get twelve years, and since he had already served two years, that would mean he would serve ten more years.[54] Trial Counsel advised Mr. Reed he might get the mandatory sentence, as Dixon had.[55]

On January 13, 2020, instead of going to trial, Mr. Reed pled guilty to Manslaughter[56] and *nolo contendere* to the weapons charge. I conducted the formal and typical plea colloquy with Mr. Reed required of me by law, including the Superior Court Criminal Rules.[57] Mr. Reed was given appropriate advice at the plea hearing, including the crimes to which he was entering a plea, the effect of the pleas including the effect of the *nolo contendere* plea, and the potential sentences. Mr. Reed signed a Plea Agreement as well as a Truth-in-Sentencing Guilty Plea Form which outlined what was happening. I also reviewed with Mr. Reed the important rights he surrendered by pleading as he did. Finally, Mr. Reed admitted to me he was

---

[51] A428.
[52] *Id.*
[53] *Id.*
[54] A294.
[55] A295.
[56] 11 *Del. C.* § 632.
[57] Super. Ct. Crim. R. 11.

guilty of manslaughter, and that the *nolo contendere* plea to the weapons charge was as effective as a plea of guilty.

The day before sentencing, Trial Counsel gave Mr. Reed a draft "remorse letter" for Mr. Reed to rewrite in his own words and read to me at sentencing.[58] Mr. Mr. Reed did so.[59]

Mr. Reed was asked by the State why, if he had an unwavering desire to withdraw his guilty plea, he did not speak up at sentencing. Mr. Reed responded that he was told by Trial Counsel only to read the remorse letter and that saying anything else could jeopardize him.[60] Mr. Reed said that he had written a letter to me about withdrawing the plea, but had heard nothing back. When asked why he never raised this, he stated that he "hoped" I would say something about it.[61]

I asked Mr. Reed directly why he did not speak up at sentencing about his desire to withdraw his guilty plea. Mr. Reed again stated that he had been told by Trial Counsel only to read his remorse letter. He also thought the issue was being dealt with by me, since he had written letters to me and never received anything back.[62]

---

[58] A304, A429-430.
[59] A431-433.
[60] A321-322.
[61] A322-323.
[62] A330-331.

16

After entry of his guilty plea, Mr. Reed notified Trial Counsel that he wanted to withdraw it. Trial Counsel told Mr. Reed he would check into the possibility of withdrawing the plea, based upon Mr. Reed's allegations that a witness had changed his story in a statement to police.[63] At their next meeting, however, Trial Counsel told Mr. Reed that his allegations had not panned out, and that it was not in Mr. Reed's best interest to withdraw his plea. Trial Counsel told Mr. Reed there was no legal basis for plea withdrawal.[64]

On cross-examination, Mr. Reed stated that, while incarcerated, he had indicated to Trial Counsel that he would entertain a guilty plea to Manslaughter.[65] He had signed off on a guilty plea to Manslaughter on two separate occasions: January 3, 2020 and January 13, 2020.[66] He had familiarity with plea agreements because he had prior arrests and felony cases in both Sussex County and Kent County, and had been represented by counsel in those cases.[67] Those counsel had discussed with Mr. Reed the differences between a jury trial and a bench trial, and all but one of those cases had been resolved by guilty pleas; the one case was

---

[63] A300.
[64] A302.
[65] A307.
[66] A308.
[67] A309.

resolved by a bench trial.[68]   Mr. Reed had never before signed a plea agreement before "just in case" he needed it later.

In the week before trial, Mr. Reed discussed the plea with his mother and girlfriend, but they did not ask him to plead guilty if he did not want to do so.[69]

### *Ronald Phillips, Esquire*

Mr. Phillips discussed the plea offer with Mr. Reed on January 2 and 3, 2020. Although he did not think Mr. Reed signed the plea just "in case he changed his mind,"[70] he was not particularly confident Mr. Reed would go through with the plea, and he was not surprised when Mr. Reed rejected the plea on January 6, 2020.[71]

Mr. Phillips did not recall whether he discussed with Mr. Reed the odds of success at trial, but said it was possible.[72] Mr. Phillips testified that his record on murder trials in Sussex County was "0 for 3" while his record in Kent County was "split."[73] He did not recall mentioning the sentence in another murder case that went to trial.[74] As to what sentence Mr. Reed would get if he pled guilty, Mr. Phillips

---

[68] A310.
[69] A313.
[70] A338.
[71] A341.
[72] A342.
[73] A389.
[74] A350.

testified he probably told him his idea of what it would be, but that the final decision was up to me.[75]

Mr. Phillips was 99% certain that they did not discuss the jury or its makeup during the meetings on the morning of trial, June 13, 2020.[76] It would have happened in the weeks leading up to trial.[77] Mr. Phillips would have had more than one conversation with Mr. Reed about the jury, one a broad overview and another, more specific conversation closer to trial.[78] During these conversations, Mr. Phillips would have told Mr. Reed that it is very difficult to get a diverse jury in Sussex County but that Trial Counsel would work very hard to get a diverse jury.[79] Mr. Phillips never told Mr. Reed—or, for that matter, any other client—that he could not get a fair trial in Sussex County.[80] Mr. Phillips never told Mr. Reed that the jury would decide the case based on his race.[81]

With respect to his statement in the Trial Counsel Affidavit that "juries in Sussex tend to be older and whiter than the general population," Mr. Phillips stated that he had "probably objected to every jury panel I've ever had about the makeup

---

[75] A348.
[76] A354.
[77] *Id.*
[78] A380.
[79] A383.
[80] A352, A388.
[81] A387.

19

of the jury."[82] However, he "would not have said he couldn't have gotten a fair trial period."[83] Mr. Phillips testified that the context of the conversation would have been about the jury pool itself and that he would be objecting if he was unhappy with the jury pool.[84] Having practiced in all three Delaware counties, Mr. Phillips testified as to Sussex County, "having been here for a long time, you know, for a long time it was difficult to look out into a jury panel and see a head that wasn't white or bald."[85] This was relevant to Mr. Phillips because the people who ended up in the jury panel do not have the same experience with criminal law enforcement as do the defendants.[86]  Mr. Phillips testified that in Sussex jury panels, "growing up here, there's a mindset, I think, when you get a particular group of people, particularly the older and whiter group."[87] That mindset it more conservative. Their experience with law enforcement is mostly positive, so they believe that if the defendant was arrested, he is probably guilty. Mr. Phillips acknowledged "it's uncomfortable for people to say, but it's just the fact."[88]  Mr. Phillips went on to explain that everyone comes into jury service with their own implicit biases. Mr. Phillips explained diversity helps to hold people accountable in the jury room.[89] He had learned this from professional

---

[82] A351-352.
[83] A352.
[84] A353.
[85] A384.
[86] *Id.*
[87] A385.
[88] *Id.*
[89] A386.

20

seminars.[90]  In a trial, evidence would have been presented involving guns, possible drug deals and other activities that would be negatively perceived by an older and whiter jury.[91]  Phillips gives the same advice to all his clients, including his white clients.[92]

Mr. Phillips did not consider his statements to Mr. Reed about the age and racial makeup of the jury to constitute ineffective assistance of counsel under the performance prong of *Strickland*.[93]

Mr. Phillips had little recollection of the typed and handwritten versions[94] of the remorse letter that Mr. Reed was to read at sentencing. He did not recall if he typed it up or Ms. Murray did.[95] He thought the typewritten document was done first, because Trial Counsel had discussed with Mr. Reed what he would say at sentencing.[96]

On June 13, 2020, the day of trial, Mr. Phillips met with Mr. Reed when the courthouse doors opened.  Mr. Phillips and the State negotiated a plea agreement for ten years, and Mr. Phillips at some point before 10:52 a.m. wrote to the State, "yes

---

[90] A386.
[91] A395-396.
[92] A388–89.
[93] A358.
[94] A429-433.
[95] A360.
[96] A361.

to plea."[97] After that, Mr. Phillips stated that Mr. Reed informed him he wanted to withdraw the guilty plea several times.[98] He was familiar with the *Scarborough* factors, particularly because a research assistant had provided a memo about them.[99] Mr. Phillips told Mr. Reed that, after checking into the possibility that a witness changed his story, the story was inaccurate and thus there was no basis for plea withdrawal.[100]

### Julianne Murray, Esquire

Ms. Murray testified briefly. She did not recall whether she attended the January 2, 2020 meeting in which the plea was discussed with Mr. Reed.[101] She did recall speaking with Mr. Reed's girlfriend after Mr. Reed rejected the plea on January 6, 2020 and visiting Mr. Reed again just before trial.[102] Ms. Murray testified she would have discussed with Mr. Reed whether he had changed his mind about the plea based upon discussions with his girlfriend and his family.[103]

Ms. Murray recognized the handwritten paper[104] with the various sentence possibilities and the circled number ten as being written by her.

---

[97] A465.
[98] A355-356.
[99] A357, A466.
[100] A359.
[101] A402.
[102] A405.
[103] *Id.*
[104] A428.

22

Ms. Murray attended the June 13, 2020 meeting with Mr. Reed. She did not specifically recall what was said in this meeting, except that her impression was that Mr. Reed was still weighing whether to take the plea.[105] Ms. Murray also did not recall any discussion of race or jury makeup at that morning meeting.[106]

Ms. Murray was not involved in the discussions with Mr. Reed about withdrawing his plea.[107] She was, however, aware of Mr. Reed's several letters and motions regarding his desire to withdraw his plea.[108] Ms. Murray testified that Mr. Reed never rescinded his request to withdraw his plea.[109]

Ms. Murray never heard Mr. Phillips make statements to Mr. Reed that he could not get a fair trial in Sussex County because he was black, nor did she make such statements herself.[110] Ms. Murray, like Mr. Phillips, did not consider Mr. Reed's allegation that he took the plea because of comments regarding race made by Trial Counsel to be a reason to move to withdraw the plea.[111]

Ms. Murray recalled typing up the remorse letter Mr. Reed was to put in his own words and read at sentencing. She did not recall the handwritten version.[112] She

---

[105] A409.
[106] A409–10.
[107] A411.
[108] A414.
[109] *Id.*
[110] A424.
[111] A415.
[112] A416.

did not recall which came first.[113] Ms. Murray did not recall what advice she gave to Mr. Reed as to what to say at sentencing, but testified, "I imagine I probably would have given him some advice regarding what he could say or what would be advisable to say."[114]

## V.    ADVICE CLAIM

The allegations in Mr. Reed's Amended Rule 61 Motion concern privileged communications between Mr. Reed and Trial Counsel. Mr. Reed and Trial Counsel disagree over whether absolute comments were made, the nature of any related discussions, and when those discussions took place. Their accounts are wholly inconsistent. Thus, my factfinding mission requires me to determine whose testimony to credit: Mr. Reed's, on the one hand, or Trial Counsel's, on the other. Whereas Trial Counsels' testimonies largely corroborated each other, within the constraints of memory, Mr. Reed's account is uncorroborated, inaccurate, and self-serving, and it flatly contradicts his representations at the plea colloquy.

### *Performance Prong*

Trial Counsel have consistently denied telling Mr. Reed that he would not receive a fair trial because of his race. In their First Trial Counsel Affidavit, Trial Counsel generally denied Mr. Reed's allegation.[115] While a general denial was

---

[113] *Id.*
[114] A417.
[115] A169–72.

24

inadequate given the gravity of the allegation,[116] it was still a denial.  In their Second Trial Counsel Affidavit, Trial Counsel specifically denied advising Mr. Reed that he would not get a fair trial because of his race.[117]  During the evidentiary hearing, Mr. Phillips and Ms. Murray maintained that they did not tell Mr. Reed he could not get a fair trial because of his race.[118]

Mr. Reed characterizes Trial Counsel's testimony as "bereft of detail" in comparison to his own.[119]  Mr. Reed's account of the January 13, 2020 meeting may be detailed, but in my view those details are not credible.  His account is directly contradicted by two witnesses, Mr. Phillips and Ms. Murray, and contains notable inaccuracies.

First, Mr. Reed claims that Mr. Phillips told him during the January 13, 2020 meeting that he could not receive a fair trial in Sussex County because of his race.[120]  As detailed above, Mr. Phillips and Ms. Murray both deny making any such statement to Mr. Reed.  Ms. Murray did not recall any conversation about the makeup of the jury pool that morning, and Mr. Phillips was 99% sure it did not happen then.

---

[116] *See Reed*, 258 A.3d at 826.
[117] A269–70.
[118] A352, A354, A409–10, A424.
[119] Opening Br. 16.
[120] Opening Br. 19–22.

Second, Mr. Reed claims that Mr. Phillips told him he lost both murder trials he defended in Sussex County but won each one he tried in Kent County, to demonstrate "how the system [is more] messed up in Sussex County than it is in Kent County and there's no winning in Sussex County."[121] This is demonstrably not Mr. Phillips' record, suggesting that the stark contrast between Kent County and Sussex County does not exist. It is improbable that Mr. Phillips, whose preference "after all that preparation would have been just to go to trial,"[122] would misrepresent his record to persuade Mr. Reed to plead guilty. Ms. Murray did not recall any discussion of Mr. Phillips's record during the January 13 meeting.[123]

Third, Mr. Reed claims that Mr. Phillips had previously characterized Mr. Reed's odds of succeeding at trial as 50/50 but dropped them to 20/80 during the exchange about the unfairness of the system.[124] Mr. Phillips doubted he would have expressed Mr. Reed's chance numerically, and Ms. Murray did not recall it.[125]

Fourth, Mr. Reed claims that Mr. Phillips shared "the cautionary tale of Macarthur Risper"—who rejected a plea offer, went to trial, and received a sentence of life plus 32 years in prison—to persuade him to accept the plea.[126] Mr. Phillips

---

[121] A296–97; *see also* Opening Br. 19 (referring to Mr. Phillips's testimony on this matter).
[122] A347.
[123] A410.
[124] Opening Br. 19–20; A288–89.
[125] A342, A350, A409–10.
[126] Opening Br. 19; A297–98.

did not recall doing that and did not believe he would.[127] Ms. Murray also did not recall any discussion about other murder cases during the January 13, 2020 meeting.[128]

Fifth, Mr. Reed claims that Trial Counsel advised him that he would receive only a 12 year minimum mandatory sentence if he accepted the State's plea offer because his co-defendant, Mr. Dixon, also received a minimum mandatory sentence.[129] Mr. Reed relies on Ms. Murray's handwritten notes from a meeting with Mr. Reed, where the number "10" is circled next to charges in the plea offer.[130] Mr. Reed says that Trial Counsel presented 10 years as the remainder of the 12-year sentence (he had already served two).[131] However, the minimum mandatory sentence for Manslaughter and PFDCF, is 7 years, not 12 years.[132] This is reflected in Ms. Murray's notes where, next to the circled "10," she identified the plea offer's penalty range as "7–50" years.[133] These notes do not corroborate Mr. Reed's claim that Trial Counsel were assuring him that he "should get the minimum" because his "codefendant got the minimum of everything."[134] Rather, the notes support the

---

[127] A350.
[128] A410.
[129] Opening Br. 19; A294–95; *see also* Opening Br. 24–25.
[130] A428.
[131] Opening Br. 19, 25.
[132] Manslaughter is a class B felony, and the mandatory minimum sentence for class B felonies is two years at Level V. 11 *Del. C.* §§ 632, 4205(b)(2). The mandatory minimum penalty for Reed's PFDCF conviction was five years at Level V. 11 *Del. C.* § 1448(e)(1)b.
[133] A428.
[134] A295.

testimony of Mr. Phillips, who believed Mr. Reed would receive a 10- to 15-year sentence, but not the minimum.[135]

Sixth, Mr. Reed claims that Mr. Phillips, and only Mr. Phillips, came to the prison on January 12, 2020 to discuss the State's plea offer in person.[136] Contemporaneous text messages show, however, that Ms. Murray went to the prison on January 12, 2020 while Mr. Phillips stayed behind to prepare for trial.[137] Ms. Murray confirmed that she was the one who visited Reed that day.[138]

Seventh, Mr. Reed claims that Mr. Phillips authored the notes about sentencing on January 13, 2020 while urging him to accept the State's plea offer.[139] But Mr. Phillips denied writing it, and Ms. Murray identified it as her handwriting.[140]

Eighth, and of great importance to me, Mr. Reed's account is contradicted by his own statements at the time of the plea. Mr. Reed told me that he was satisfied with Trial Counsel's representation of him.[141] He testified that no one forced him to plead guilty.[142] He completed a TIS Form and affirmed that his answers were truthful.[143] Absent clear and convincing evidence to the contrary, Mr. Reed's

---

[135] A377.
[136] A314–15.
[137] A450–52.
[138] A405.
[139] *See* A292–93.
[140] A346–47, A406.
[141] A80.
[142] A83–84.
[143] A81, A89.

28

answers on the TIS Form and his statements during the plea colloquy are presumed to be truthful.[144] Mr. Reed's own self-serving, uncorroborated testimony is not clear and convincing evidence.

I find Trial Counsel credible in their testimony that they never said to Mr. Reed that "no Black man can ever get a fair trial in Sussex County." They testified that the issue of race was discussed in much more appropriate, nuanced terms.

I have no doubt that Mr. Reed wanted to enter a plea to lesser charges than those to which Mr. Dixon had pled. He understandably thought he would receive a sentence of less incarceration than Mr. Dixon. For the reasons I articulated both at his sentencing and in my 2020 opinion, I was of a different opinion. I sentenced Mr. Reed to essentially the same punishment as Mr. Dixon. In my view, Mr. Reed then made the claim that Trial Counsel told him that "no Black man can ever get a fair trial in Sussex County" to create a way out of the sentence I had imposed.

As discussed above, in its 2021 opinion the Delaware Supreme Court held that a lawyer who gives such advice violates the performance prong of *Strickland*. I agree with that proposition. However, the advice which Mr. Reed alleges he was given is the most egregious possible articulation of the issue of race in legal matters.

---

[144] *Savage v. State*, 2003 WL 214963, at *2 (Del. Jan. 31, 2003); *Somerville v. State*, 703 A.2d 629, 632 (Del. 1997).

Anecdotal stories also support the belief that racial bias should be considered and discussed. Toni Morrison wrote elegant and awful fiction about the horrors of slavery in her Pulitzer Prize winning book, *Beloved*. While the story is fiction, it is historically accurate. I find it unsurprising that a racial group which was subjected to the horrors of slavery, and all that followed, would harbor a bit of distrust of the institutions which allowed the horror to continue for so long. In short, competent counsel should discuss the issue of race with the client. For me, one can staunchly defend our criminal justice system while still recognizing racial bias issues. *Voir dire* may help in addressing implicit racism in the jury pool, but it does not eliminate it. We all want a race neutral system, but we do not have to pretend that one exists today.

Because I do not believe that Trial Counsel told Mr. Reed that "no Black man can ever get a fair trial in Sussex County," but rather provided a more nuanced discussion of the factor of race in criminal trials, I find that Mr. Reed has not demonstrated that the performance prong of *Strickland* has been met.

This being the case, it is unnecessary to address the prejudice prong of *Strickland*.[145] However, I will briefly do so. In its 2021 decision, the Delaware

---

[145] I agree with the Delaware Supreme Court and the State that, *if* Trial Counsel had told Dixon that "no Black man can ever get a fair trial in Sussex County," not only would the performance prong have been met, but the prejudice prong of *Strickland* would have been met as well, and Trial Counsel's representation would have been ineffective.

Supreme Court stated that, if Trial Counsel advised Mr. Reed that he would not receive a fair trial because of his race, "there is a reasonable probability that had counsel not made such an error, Reed would not have entered a plea and the second *Strickland* prong would be satisfied."[146]  As discussed above, in my view Trial Counsel did not give such absolute advice.  Thus, the second prong of *Strickland* is not satisfied *per se* under the Delaware Supreme Court's decision remanding this case.  However, I will examine whether Trial Counsel's advice, assuming *arguendo* that it was deficient, resulted in prejudice to Mr. Reed by inducing his guilty plea.

### *Prejudice Prong*

I find that Trial Counsel's advice regarding race and jury selection did not result in prejudice to Mr. Reed because it did not cause him to plead guilty when he otherwise would not have done so. Mr. Reed claims that what led him "to change his position from not taking to taking the plea was that crucial meeting on the morning of trial."[147]  But the allegedly deficient advice about race and the makeup of the jury did not occur that morning.  Mr. Phillips was 99% sure it did not happen, and Ms. Murray did not recall it.

Rather, events immediately preceding the trial date, and not the race and jury advice given weeks earlier, caused Mr. Reed to accept the State's plea offer.  Those

---

[146] *Reed*, 258 A.3d at 826.
[147] Opening Br. 18.

precipitating events were Mr. Reed's conversations with his family and his girlfriend, the mother of his child. Their concern was minimizing Mr. Reed's sentence. During the week between Final Case Review and trial, Mr. Phillips and Ms. Murray had conversations with Mr. Reed's family and girlfriend, who wanted Mr. Reed to take the plea.[148] Mr. Phillips told the State that Mr. Reed's sister and brother "were going to see him this weekend" and "think he should have taken [the plea]."[149] At the prison on January 12, Ms. Murray and Mr. Reed talked about Mr. Reed's girlfriend giving birth and whether he would be able to see his child outside of prison.[150] Mr. Reed told Ms. Murray that he wanted to discuss it more with his girlfriend, giving Ms. Murray the impression that he was leaning toward taking the offer.[151] The next morning, Mr. Reed was still nervously weighing whether to accept the plea offer.[152] Trial Counsel assured Mr. Reed that they were ready for trial.[153] Nevertheless, they discussed Reed's sentence exposure in light of the possible choices and outcomes.[154] The ultimate sentence was always one of Mr. Reed's chief concerns.[155] Ms. Murray advised Mr. Reed that sometimes taking a plea is about

---

[148] A369–70, A404–05.
[149] A451.
[150] A405, A421.
[151] A421–22.
[152] A409.
[153] A409.
[154] A371, A422–23.
[155] A364–65, A423.

damage control and that Manslaughter had less sentence exposure than Murder.[156] Mr. Reed decided to accept the State's plea offer, Ms. Murray believed, because of Mr. Reed's conversations with his girlfriend.[157]

Mr. Reed denies that his family persuaded him to accept the State's plea offer.[158] He claims that he never agreed to accept the State's plea offer until he received Trial Counsel's advice on the morning of trial.[159] Similarly, Mr. Reed claims that he did not intend to accept the State's plea offer on January 3, 2020 when he signed a plea agreement and completed the TIS Form.[160] He says that Trial Counsel advised him to sign the paperwork "just in case you change your mind."[161] But Mr. Phillips testified: "I don't know that we would have signed it just in case. I think that we signed it to take the plea."[162] Mr. Phillips acted accordingly: he emailed the signed plea agreement and TIS Form to the State,[163] and he called to schedule a plea-by-appointment hearing for Monday rather than wait until Wednesday's Final Case Review.[164] If Mr. Reed was leaning toward rejecting the

---

[156] A423.
[157] A410–11.
[158] *See* A313.
[159] A280–87.
[160] A283–84.
[161] A283.
[162] A338.
[163] A340.
[164] *See* A340–41.

offer or needed more time to consider it, there would have been no reason to schedule an earlier hearing. The plea offer did not have an expiration date.[165]

The record developed on remand at the evidentiary hearing demonstrates that Mr. Reed struggled with pleading guilty, repeatedly changed his mind, and ultimately entered the plea after consulting with his family and girlfriend. He sought to withdraw his plea because, consistent with his history of uncertainty, he changed his mind yet again about whether admitting guilt would secure a lesser sentence.

In my view, in addition to not proving the performance prong of *Strickland* with respect to the Advice Claim, I find that Mr. Reed has not proved the prejudice prong of *Strickland* with respect to the Advice Claim. Thus, I find that Mr. Reed has not proven his Advice Claim, the advice given by Trial Counsel did not adversely affect the voluntariness of Mr. Reed's guilty plea, and the guilty plea stands.

## VI. WITHDRAWAL CLAIM

### *Performance Prong*

As discussed above, the Delaware Supreme Court in its 2021 decision held that, since Mr. Reed asked Trial Counsel to file a motion to withdraw his guilty plea before sentencing and did not rescind that request, and since Trial Counsel failed to file the motion or clear the way for Mr. Reed to file it himself, such failure

---

[165] A469.

34

constituted deficient performance under *Strickland*. The remaining question is whether this failure also satisfies the prejudice prong of *Strickland*.

### *Prejudice Prong*

To satisfy *Strickland's* prejudice prong, Mr. Reed "must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[166] A reasonable probability is a "probability sufficient to undermine confidence in the outcome," a standard lower than "more likely than not."[167] "The likelihood of a different result must be substantial, not just conceivable."[168] Thus, in the plea withdrawal context, Mr. Reed must show that there is some reasonable probability that, but for Trial Counsel's error, Mr. Reed would have insisted on going to trial and the trial court would have granted his motion to withdraw the plea.

Under the Superior Court Criminal Rules, the Superior Court "may permit withdrawal of the plea upon a showing by the defendant of any fair and just reason."[169] The decision whether to grant the motion "rests in the sound discretion of the trial court, and is reviewable only for abuse of discretion."[170] My discretion in considering a plea withdrawal motion must give due weight to the proceedings by

---

[166] *Starling v. State*, 130 A.3d 316, 325 (Del. 2015) (quoting *Strickland*, 466 U.S. at 694).
[167] *Id.*
[168] *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 112 (2011)).
[169] Super. Ct. Crim. R. 32(d).

[170] *State v. Insley*, 141 A.2d 619, 622 (Del. 1958).

35

which the plea was taken and the presumptively truthful statements the defendant made in the colloquy.[171] The Delaware Supreme Court has observed that:

> Where the defendant has signed his Truth-in-Sentencing Guilty Plea Forms and has answered at the plea colloquy that he understands the effects of the plea, the defendant must show *by clear and convincing evidence* that he did not sign those forms knowingly and voluntarily.[172] (Emphasis Supplied)

The Delaware Supreme Court has identified five factors that must be specifically examined by the trial court in reaching its decision. These five factors are: (1) was there a procedural defect in taking the plea; (2) did the defendant knowingly and voluntarily consent to the plea agreement; (3) does the defendant presently have a basis to assert legal innocence; (4) did the defendant have adequate legal counsel throughout the proceedings; and (5) does granting the motion prejudice the State or unduly inconvenience the Court.[173] Though inquiry into each is mandatory, the *Scarborough* factors need not be weighed equally, and in the proper case the trial court may in its discretion find that "some of these factors of themselves may justify relief."[174]

---

[171] *Scarborough*, 938 A.2d at 649.
[172] *Id.* at 650.
[173] *Id.*
[174] *Id.* ("[t]hese factors are not factors to be balanced; indeed, some of the factors in and of themselves may justify relief.").

In its 2021 opinion, the Delaware Supreme Court noted that the effect of the *Strickland* prejudice prong on the Delaware plea withdrawal standard was an issue of first impression in Delaware. The *Strickland* prejudice prong requires only a showing of a "reasonable probability" that a motion to withdraw the plea would be granted (a lower standard), whereas Rule 32(d) requires a showing of a "fair and just" reason to withdraw a guilty plea (a higher standard). This raises the question of whether the higher or lower standard applies in the Delaware plea withdrawal context.[175] However, the Delaware Supreme Court did not have to decide this issue, because its inquiry was limited to whether Mr. Reed was entitled to an evidentiary hearing to develop facts that would address his Rule 61 claims.

In a case after its 2021 *Reed* decision, the Delaware Supreme Court again considered a defendant's claim that his counsel was ineffective for failing to file a motion to withdraw his guilty plea as he instructed. Citing *Reed*, the Court, as in *Reed*, assumed that defendant had satisfied the first prong of *Strickland*. The Court went on to state:

> To satisfy the second prong of *Strickland* in the plea withdrawal context, [the defendant] must show a reasonable probability that, but for his counsel's error, he would have insisted on going to trial and the

[175] The Delaware Supreme Court considered several federal circuit court decisions considering *habeas corpus* petitions based upon state convictions alleging an unreasonable failure to move to withdraw a plea. Those decision held that the defendant need only show that there is "reasonable probability" that the motion would have been granted to satisfy *Strickland*. But the relief granted in those cases contemplated the defendant being permitted to litigate the underlying plea withdrawal standard, not an order vacating the plea. The Delaware Supreme Court found those federal cases persuasive as to the "reasonable probability" (lower) standard.

trial court would have granted his motion to withdraw plea. Under Rule 32(d), [the defendant] bears the burden of showing a fair and just reason to permit withdrawal of his plea. The relevant factors to consider are whether: (i) there was a procedural defect in taking the plea; (ii) the defendant voluntarily entered the plea; (iii) the defendant had a basis to assert legal innocence; (iv) the defendant had adequate legal counsel; and (v) granting the motion would prejudice the State or unduly inconvenience the court.[176]

Thus, I will decide whether, based upon the evidence at the evidentiary hearing, Mr. Reed has demonstrated a "reasonable probability" that, but for Trial Counsel's error, he would have insisted on going to trial. Then I will decide whether I would have granted his motion to withdraw his guilty plea, based on a "fair and just" reason applying the five *Scarborough* factors.

I find that Trial Counsel conducted research to adequately consider the *Scarborough* factors when they decided to override Mr. Reed's instructions regarding the plea withdrawal motion. However, I find that Mr. Reed never rescinded his instructions to Trial Counsel to withdraw his guilty plea prior to sentencing, but Trial Counsel failed to do so, or clear the way for Mr. Reed to do so. This violates the holding of the 2021 *Reed* holding. Thus, Mr. Reed has demonstrated a reasonable probability that, but for Trial Counsel's error, he would have filed a motion to withdraw his guilty plea before sentencing and insisted on going to trial.

---

[176] *Morrison v. State*, 2022 WL 790507 at *5 (Del. Supr. March 16, 2022). (Footnotes and Citations Omitted)

I must still decide whether I would have granted his motion to withdraw his guilty plea before sentencing, based on a "fair and just" reason applying the five *Scarborough* factors. I find that I would not have granted his motion to withdraw his guilty plea, for the reasons discussed below.

### No Procedural Defect in Taking the Plea

All parties agree that my colloquy with Mr. Reed was in full compliance with legal and procedural requirements. The Delaware Supreme Court stated:

> Just such a procedurally proper plea colloquy occurred here. The Superior Court rules identify what rights the trial court must advise the defendant of prior to accepting the plea to ensure the plea is informed, and what inquiries the trial court must make to ensure the agreement is voluntary. The trial judge engaged in a plea colloquy with the defendant directly, confirming that Reed understood the meaning and import of the plea agreement's terms, and what procedural and substantive rights he was surrendering.
>
> It is undisputed that the trial judge conducted a conforming colloquy in this case, as Reed agrees that "the plea procedure was free from defect and the consent to the plea was knowing, intelligent, and voluntary."[177]

### Mr. Reed Voluntarily Entered the Plea

When I conducted the colloquy with Mr. Reed, I found that his decision to plead guilty to Manslaughter and no contest to PFDCF was knowing, intelligent, and voluntary.[178] Mr. Reed had completed a TIS Form that advised him of the rights

---

[177] *Reed*, 258 A.3d at 823. (Footnotes Omitted)
[178] A84.

he was giving up by pleading guilty, and I recounted them during the colloquy.[179] Mr. Reed indicated on the TIS Form that no one had promised him what his sentence would be.[180] He stated both on the TIS Form and during the colloquy that no one had forced him to enter the pleas.[181] Absent clear and convincing evidence to the contrary, Mr. Reed's answers on the TIS Form and during the plea colloquy are presumed to be truthful.[182]

In his Amended Rule 61 Motion, Mr. Reed claims that his decision was neither knowing nor voluntary for three reasons.[183]

First, Reed claims that Trial Counsel coerced him into pleading guilty by improperly advising that he would receive an unfair trial in Sussex County and be convicted because of his race.[184] As discussed fully above, I reject this argument.

Second, Mr. Reed contends that Trial Counsel promised he would receive the minimum sentence if he accepted the State's plea offer.[185] As discussed fully above, I reject this argument. Ms. Murray's notes indicate that she advised Mr. Reed that the penalty range was "7–50" years.[186] The number "10" circled next to it indicates

---

[179] A81, A89.
[180] A89.
[181] A83–84, A89.
[182] *Savage*, 2003 WL 214963, at *2; *Somerville*, 703 A.2d at 632.
[183] Opening Br. 23–26; A261–62.
[184] Opening Br. 23–24; A261.
[185] Opening Br. 24–25.
[186] A428.

a belief about what sentence Reed might get, consistent with Trial Counsel's testimony. Mr. Phillips believed Mr. Reed would receive a 10- to 15-year sentence, but not the minimum.[187] Even though Trial Counsel's prediction proved to be inaccurate, an attorney's "mere inaccurate prediction of a sentence" does not amount to deficient performance under *Strickland*,[188] and it does not support the conclusion that Mr. Reed's plea was unknowing or involuntary. Despite Trial Counsel's predictions, Mr. Reed knew the possible range of penalties and that the sentencing decision ultimately rested with me.[189] He indicated on the TIS Form that no one promised him what his sentence would be,[190] and he is bound by that prior statement.[191] He admitted at the evidentiary hearing that Trial Counsel advised he could get "a lot more" than 12 years and that he knew the ultimate decision rested with me.[192]

Third, Mr. Reed claims in his Amended Rule 61 Motion that Trial Counsel "provided deficient advice regarding the theory of criminal culpability upon which

---

[187] A377.

[188] *United States v. Martinez*, 169 F.3d 1049, 1053 (7th Cir. 1999); *accord Tocco v. Lewis*, 1990 WL 151269, at *3 (9th Cir. Oct. 10, 1990); *see also Jones v. United States*, 131 F. App'x 819, 821 (3d Cir. 2005) ("[T]he questions asked and answers given at the Rule 11 colloquy . . . leave[] no doubt that . . . his counsel anticipated a sentence substantially shorter than [forty years] but had discussed a potential forty year sentence with him . . . Suffice it to say, there is no act of or omission by counsel that would warrant a finding of ineffective assistance.").

[189] *See* A78, A89.

[190] A89.

[191] *Savage*, 2003 WL 214963, at *2; *Somerville*, 703 A.2d at 632.

[192] A295, A324–25.

Mr. Reed would be convicted."[193]  This claim is based on statements that Mr. Reed

and Trial Counsel made during the sentencing hearing,[194] when Mr. Reed had

already pled guilty to Manslaughter and PFDCF, and Trial Counsel were attempting

to present his actions in the best possible light, given that plea.   From these

statements, Mr. Reed alleges that Trial Counsel provided deficient advice by telling

him that "he could be found guilty of intentional murder because he encouraged a

fistfight and the homicide was reasonably foreseeable" and that "he could be found

guilty of PFDCF on a theory of constructive possession."[195]   In their Second Trial

Counsel Affidavit, Trial Counsel detail the theories of culpability they explained to

Mr. Reed and distinguished them from their presentation at sentencing.[196]   Trial

Counsel's advice was reasonable, and the arguments in the Amended Rule 61

Motion are inapposite.[197] Following the Second Trial Counsel Affidavit, Mr. Reed

did not argue the issue at the evidentiary hearing or in his opening brief.  I conclude

that Trial Counsel's reasonable legal advice did not affect the validity of Reed's

guilty pleas.

*Mr. Reed Had No Basis to Assert Legal Innocence*

---

[193] A261.
[194] *See* A261 (cross-referencing A252–58).
[195] A257–58.
[196] A271–72.
[197] *See* A252–58.

In his Amended Rule 61 Motion, Mr. Reed asserts his legal innocence. First, he denies shooting Mr. Hatton.[198] Second, he points out that the police recovered only a single 9mm projectile, but witnesses saw Mr. Reed with a revolver.[199] Projectiles are often not recovered, however, and the lack of shell casings would be consistent with the use of a revolver. In any event, the discovery of ballistics evidence was not required to convict Reed of the offenses.[200] Third, the State's witnesses would be subject to cross-examination.[201] Fourth, the surveillance video showed that Mr. Reed was not involved in any disagreement with Mr. Hatton at the deli before the shooting.[202] Mr. Reed argues that his proffered motive—shooting Mr. Hatton because Mr. Hatton owed him money—was less believable than the motives of the people involved in the disagreement at the deli.[203]

In my view, Mr. Reed's claims lack the weight and credibility of the State's evidence and do not amount to a legally cognizable defense. He also does not suggest that the State would be incapable of proving the charges as a matter of law. Indeed, the State identified four witnesses who would identify Mr. Reed as someone

---

[198] A262.

[199] A262.

[200] *Cf. State v. Capobianco*, 2014 WL 890946, at *2 (Del. Super. Ct. Mar. 5, 2014) ("Defendant argues that the following evidence demonstrates his legal innocence: there is no physical evidence of sexual contact with the victim . . . These claims do not support the relief sought by Defendant: physical evidence is not required to support the charges on which Defendant was indicted . . . .")

[201] A263.

[202] A262–63.

[203] A263.

who shot and killed Mr. Hatton.[204] If the mere ability to challenge the weight of the State's evidence constituted a basis to assert legal innocence, this factor would cease to be a meaningful inquiry into whether there is a fair and just reason to withdraw the plea. Only perfect and unimpeachable cases would survive a plea withdrawal motion, destroying the procedural certainty the rule is designed to defend.

In a recent opinion, the Delaware Supreme Court reviewed a defendant's claim that his motion to withdraw a *nolo contendere* plea should have been granted by the Superior Court because of the second, third and fourth of the *Scarborough* factors, where he asserted that he had a valid claim of legal innocence. The facts he presented on legal innocence were self-serving and conclusory. The Delaware Supreme Court held:

> When considering an assertion of legal innocence, this Court has held that "conclusory allegations of innocence are not sufficient to require withdrawal of a guilty plea, especially where the defendant has admitted his guilt in the plea colloquy."[205] (Footnotes and Citations Omitted)

As discussed above, I find that Mr. Reed's allegations of actual innocence are merely conclusory, especially given the fact that he admitted his guilt in the plea colloquy. Moreover, Trial Counsel investigated an alleged eleventh-hour change in a witness' story and found there to be no merit to the allegation.

---

[204] A133.

[205] *Savage v. State*, 2003 WL 214963, at *2 (Del. Jan.31, 2003) (ORDER).

44

*Adequacy of Trial Counsel*

As discussed above, in its 2021 *Reed* opinion the Delaware Supreme Court stated that, if Mr. Reed asked Trial Counsel to file a motion to withdraw his guilty plea before sentencing and did not rescind that request, and if Trial Counsel failed to file the motion or clear the way for Mr. Reed to file it himself, then Trial Counsel's failure constitutes deficient performance under *Strickland*.[206] However, the Delaware Supreme Court acknowledged that its decisional law on this point had not been consistent.[207] To remedy this problem, it now held for the first time:

> [A] criminal defendant's control of the objectives of the representation prior to sentencing requires that counsel either obey an instruction to file a motion to withdraw a guilty plea, or seek leave to withdraw so that the defendant can file the motion with other counsel or *pro se*.[208]

But the 2021 *Reed* decision also recognized that, as the United States Supreme Court held in *Strickland*, courts must "judge the reasonableness of counsel's challenged

---

[206] *Reed*, 258 A.3d at 829. (Footnotes Omitted) The State agreed. *See* Ans. Br. at 29–30 ("If Mr. Reed's allegation is true, then his counsel's refusal constitutes deficient performance. The decision whether or not to plead guilty is a fundamental decision that belongs to the defendant. The right encompasses the decision to pursue a plea-withdrawal motion. Thus, 'a lawyer who disregards specific instructions [to file a plea withdrawal motion] acts unreasonably.' ") (Citation Omitted).

[207] Defendants who have moved to withdraw their guilty plea in Superior Court are routinely appointed new counsel for that purpose, especially when the defendant raises claims of coercion or ineffective assistance of counsel. But the Delaware Supreme Court has also affirmed the Superior Court's refusal to appoint new counsel for a defendant seeking to withdraw a plea. *See, e.g., Mills v. State*, 2016 WL 97494 (Del. 2016); *Windsor v. State*, 2014 WL 4264915, at *3 (Del. 2014) (affirming Superior Court's refusal to consider application to withdraw a plea because counsel did not file it on defendant's behalf and noting that defendant did not apply under Rule 47 to participate with counsel in portions of his defense); *Trotter v. State*, 2018 WL 6167322, at *1 (Del. 2018) (the Superior Court did not err in denying defendant's *pro se* motion to withdraw his plea nor in refusing to appoint new counsel for him.).

[208] *Reed v. State* at 828-829.

45

conduct on the facts of the particular case, viewed as of the time of counsel's conduct."[209]

In this case, with respect to Mr. Reed's direction to Trial Counsel to withdraw his plea prior to sentencing, they were acting in good faith prior to the new *Reed* holding under existing, inconsistent law. As such, their performance was not deficient on the facts at that time. Nor did I find other incidents of deficient performance on the part of Trial Counsel.

### *Prejudice to the State or Undue Inconvenience to the Court*

Mr. Reed identifies no prejudice to the State or undue convenience to the Court should I grant his plea withdrawal motion.[210] Although the State has identified none so far, trials do not get better with time. Putting this case back on the path to trial risks problems with witness availability and memory. For me, although the importance of this factor is slight, it still weighs against granting the motion to withdraw the guilty plea.

Even if Mr. Reed had made the motion to withdraw his guilty plea before sentencing under the Superior Court Criminal Rules, I would not have granted it. I do not grant it now. Therefore, there is no prejudice under the second prong of

---

[209] *Id.* at 831.
[210] A264.

*Strickland*. I find that Mr. Reed has not proven his Withdrawal Claim and the guilty plea stands.

## VII.   CONCLUSION

Any discussion of how race may affect decision-making in the criminal law process will always be fraught with difficulty and concern.  Even considering that race may affect outcomes is troubling.  But for me the answer is not to ignore the racial issue.  The goal is race neutrality, but assuming that goal has been achieved ignores evidence to the contrary.

Without doubt, Trial Counsel were concerned with and raised the issue.  Mr. Reed turned that into its lowest common denominator to bolster his effort to get to a trial he had given up by his plea.  To me, Mr. Reed's motive was twofold.  He convinced himself he had a reasonable prospect of being found not guilty.  He was disappointed and had damaged expectations by the sentence he received.

Taking the latter issue first, I sentenced Mr. Reed to virtually the same sentence as Mr. Dixon, who pled guilty to a more serious offense. While I was critical of the process the parties followed in reaching a plea agreement, I relied heavily upon the statements made by Mr. Dixon, the thorough pre-sentence investigation prepared by our Court officers.  Although the information in the reports has not been tested by the trial process, it is reliable.  The evidence that Mr. Reed was the predominant and motivating force behind the killing of Mr. Hatton was substantial.

Mr. Reed's efforts throughout this process have showed buyer's remorse supported by what I have found to be incredible attacks on Trial Counsel. I suspect Mr. Reed now has convinced himself that what he says his lawyers told him is true, but that does not make it so.

I heard both Mr. Dixon and Mr. Reed at their sentencing hearings, and reviewed what they said and everything else in the pre-sentencing reports. I have listened to what Mr. Reed told me in the Rule 61 evidentiary hearing as directed by our Supreme Court. I have followed the Supreme Court's directives to the best of my ability. The result I have reached is that Mr. Reed had a fair process and made knowing and intelligent decisions. Trial Counsel spoke in words he understood. The evidence the State arrayed against him was substantial and convincing.

For the foregoing reasons, Defendant Jerry Reed's Amended Motion for Postconviction Relief is **DENIED**.

**IT IS SO ORDERED**.

/s/ Craig A. Karsnitz
Judge Craig A. Karsnitz

cc:    Prothonotary